**Giancarlo PARRETTI, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

No. 95–56586.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 21, 1995.

Decided May 6, 1997.

As Amended Aug. 29, 1997.

---

Richard J. Beada, Santa Monica, CA, and William J. Genego, Santa Monica, CA, for petitioner-appellant.

George S. Cardona, Assistant United States Attorney, Los Angeles, CA, for respondent-appellee.

Before: PREGERSON, NORRIS, and REINHARDT, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge.

On October 18, 1995, federal agents entered the Los Angeles office of the law firm of White & Case, interrupted a deposition being given by appellant Giancarlo Parretti and arrested him. The arrest was made pursuant to a warrant issued that morning on the basis of allegations contained in a French arrest warrant charging Parretti with extraditable crimes. After his arrest, Parretti was held without bail pending a decision by the French government whether to request his surrender at a later date.

Parretti's appeal presents two constitutional questions: First, did the warrant issued for Parretti's arrest violate the Fourth Amendment? Second, did Parretti's detention without bail before his extradition hear-

ing violate the Due Process Clause of the Fifth Amendment?

# I

## BACKGROUND

In 1990, a corporation headed by Giancarlo Parretti, an Italian citizen and resident, purchased MGM–United Artists for $1.3 billion. This leveraged transaction, which resulted in the formation of MGM–Pathe Communications Corporation, gave rise to a number of lawsuits. On October 9, 1995, Parretti entered the United States in order to answer charges of perjury in connection with one of these suits in Delaware, and to attend his own deposition in connection with another in Los Angeles. The following day, France forwarded a diplomatic note to the Department of State requesting Parretti's "provisional arrest" pursuant to Article IV of the Treaty of Extradition between the United States and France, Jan. 6, 1909, U.S.–Fr., 22 U.S.T. 407, *as amended*, Feb. 12, 1970, T.I.A.S. 7075, so that he might be held in custody in case France decided to request his surrender at a later date.

Parretti was arrested pursuant to a warrant issued by United States Magistrate Judge Joseph Reichmann on the basis of allegations contained in a "Complaint for Provisional Arrest Warrant" sworn to on information and belief by an assistant United States Attorney ("AUSA") for the Central District of California, "acting on behalf of the Government of France" (the "Complaint"). The AUSA alleged that Parretti had been charged in an international arrest warrant issued in France on May 3, 1995, with various crimes arising from his alleged looting of the French company Europe Image Distribution (EID), one of MGM–Pathe's subsidiaries; that each of the offenses charged in the French arrest warrant [1] was an extraditable offense under the treaty; and that France

had requested Parretti's "provisional arrest" under Article IV of the treaty. Article IV provides for the "arrest and detention of a fugitive ... on information ... of the existence of ... a warrant of arrest" and for the person "provisionally arrested" to be held for up to 40 days pending a possible request that the fugitive be extradited. At the time the AUSA filed the Complaint, France had not requested Parretti's extradition.[2]

The sole basis for the allegations of wrongdoing made in the AUSA's Complaint is the French arrest warrant. In other words, the AUSA simply alleges on information and belief that the French arrest warrant contains various allegations of wrongdoing by Parretti. Complaint ¶ 2 (stating that the French warrant and the diplomatic note requesting Parretti's arrest "provide the basis for the statements set forth below"), ¶ 5 ("The arrest warrant alleges the following facts in support of the charges...."). The French arrest warrant itself was not attached to the Complaint, nor were any affidavits or other competent evidence.

Parretti argued at his bail hearing and on his habeas petition to the district court that the warrant issued by Judge Reichmann violated the Fourth Amendment for two independent reasons. First, Parretti argued that the warrant was issued without probable cause because it was not based on evidence that Parretti had committed any of the offenses with which he was charged in the French arrest warrant. Parretti put it this way:

> [I]f you look at the language in the Complaint, what they say, is that based on the French warrant, we are stating the following. All that they are doing is regurgitating to the court what they have obtained from the warrant from France. We don't know what the investigating magistrate based those statements on.

---

1. As alleged in the Complaint, the French arrest warrant charges Parretti with: (1) misuse of the assets of EID; (2) forging documents and using them; (3) embezzlement from EID by false pretenses; and (4) knowingly attesting to materially inaccurate facts, and knowingly making use of such a false attestation.

2. The AUSA stated in the Complaint, "I am informed through diplomatic channels that the Requesting State will make a regular diplomatic request for the extradition of Parretti in conformity with the treaty and will present the completed papers upon which the demand for extradition is founded within 40 days from the date of commitment, as required by Article IV of the Treaty." Complaint ¶ 10.

ER at 150; RT at 7 (tr. of hr'g on Pet. for Habeas Corpus). In other words, Parretti argued that the record showed only that the United States warrant was based solely upon the existence of the French arrest warrant, and that the government made no showing to Judge Reichmann that the allegations contained in the French arrest warrant were based upon competent evidence.

In response, the government argued below that Judge Reichmann's determination of probable cause was "supported by specific facts that are set forth in the Complaint, relaying facts that were conveyed to the United States by France." ER at 23 (unofficial tr. of Nov. 1, 1995, hr'g on renewed bail application). The AUSA acknowledged that the "conveying of the facts was done in an informal way, that it wasn't in a way of formal evidence," but argued that "there's nothing that prohibits that." *Id.* (unofficial tr. of Nov. 1, 1995, hr'g on renewed bail application).

In denying Parretti's habeas petition, the district court ruled that the arrest warrant issued by Judge Reichmann was valid because the Complaint "alleges more than sufficient facts, with more than sufficient particularity, to establish probable cause to believe that Parretti committed the offenses with which he is charged in France." Findings of Fact, Conclusions of Law and Order denying application for bail and habeas corpus petition, filed Nov. 15, 1995, at 5–6; E.R. exh. 11, at 5–6. In rejecting Parretti's argument that the government had failed to make any evidentiary showing that he had committed a crime, the district court said at the hearing, "That's what they got [sic] 40 days to clear up and to make a presentation in their extradition proceedings." ER at 150–51; RT at 7–8.

As a second, alternative basis for challenging the validity of his arrest, Parretti argued that his arrest warrant violated the Fourth Amendment because Judge Reichmann did not make a probable cause determination. According to Parretti, Judge Reichmann effectively declared that a probable cause determination was not required for a warrant for a "provisional arrest" pursuant to an extradition treaty. In response to Parretti's

claim that his detention violated the Fourth Amendment, Judge Reichmann ruled that the government's recital of the allegations of the French arrest warrant was "sufficient at this stage." ER at 29 (unofficial tr. of Nov. 1, 1995, hr'g on renewed bail app.). In other words, Judge Reichmann held that the allegations of the French arrest warrant, as set forth in the Complaint, provided a sufficient basis for the issuance of a warrant for Parretti's "provisional arrest," even though Judge Reichmann acknowledged that these naked allegations might not be sufficient to establish probable cause at the extradition hearing itself. *Id.* at 26, 29 ("as far as what has to be done when we get to the remainder of the papers, that's another matter"; "I don't have all the papers, so I can't really make a very strong determination as [to] the possibility of success [at the extradition hearing]."). Parretti also cited the language of the warrant, which "did not even purport to find that there was probable cause, but instead 'commanded' the arrest of Parretti to have him 'answer a complaint charging him with being subject to extradition to France pursuant to a warrant of arrest issued in that country ...'" Mem.Supp.Pet. Habeas Corpus, at 14; ER at 57.

In response to Parretti's claim that Judge Reichmann issued the arrest warrant without making a probable cause determination, the government argued to the district court a novel Fourth Amendment theory: A warrant for a "provisional arrest" in an extradition case may be issued without an evidentiary showing that the accused has committed a crime. The government argued that a provisional arrest warrant may issue on a showing that the fugitive has been duly *charged* with an extraditable crime, as distinguished from an evidentiary showing of probable cause to believe he *committed* an extraditable crime. Appellee's Brief at 36 n. 10. Thus, the government asks us to read into the Warrant Clause of the Fourth Amendment a standard of probable cause that would vary depending on whether the purpose of the arrest is to hold an accused to answer charges of a foreign government or to answer domestic charges.

■ In support of this position, the government argues that the Secretary of State's decision to enforce an extradition treaty authorizing provisional arrest upon information of a foreign warrant reflects the Secretary's determination that the foreign nation's charging procedures are sufficiently reliable to satisfy the probable cause requirement of the Fourth Amendment. The government argues that under the rule of judicial non-inquiry, the federal courts must defer to the Secretary's decision and accept at face value the foreign warrant as a basis for issuing a warrant for "provisional arrest." [3] The district court did not address this argument because it held that the existence of the French arrest warrant was a sufficient basis for issuing a warrant for Parretti's arrest.[4]

The district court also rejected Parretti's bail application, even though it found that Parretti was not a flight risk. In rejecting the government's request for a finding that Parretti was a flight risk, the district court said, "I can't say that he's a flight risk.... I don't see him as a flight risk." Reporter's Tr. of Proc'gs, Nov. 9, 1995.

The district court noted that under the doctrine of "special circumstances" that has its origins in *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903), bail in extradition cases is "only granted under exceptional circumstances." ER at 148. Parretti argued that four special circumstances existed warranting bail: probable success in defeating the French extradition request on the merits, *see Salerno v. United States,* 878 F.2d 317, 317 (9th Cir.1989); his need to participate in civil litigation, *see United States v. Williams,* 611 F.2d 914, 915

(1st Cir.1979); his deteriorating medical condition, *see Salerno,* 878 F.2d at 317; and France's deliberate refusal to make any effort to extradite him from Italy for over five months after the French arrest warrant issued, which allegedly demonstrated that France did not need the 40 day period authorized by the treaty for "provisional arrests" to prepare its extradition request.

The district court rejected all of the special circumstances asserted by Parretti. It found that Parretti was likely to be found extraditable, that his continued detention was not interfering with his participation in his civil lawsuits, and that he was receiving more than adequate medical treatment while incarcerated. Findings of Fact, Conclusions of Law, & Order Denying Application for Bail and Habeas Corpus Pet., ¶¶ 12–13, 17. The district court also held that the fact that France did not seek Parretti's extradition from Italy was not a special circumstance as a matter of law. Because the requirements of the "special circumstances" doctrine were not met, the district court declined to release Parretti on bail.

After the district court denied Parretti's application for bail and petition for a writ of habeas corpus, Parretti filed a motion under Ninth Circuit Rule 27–3 seeking emergency review.[5] We granted his motion and ordered him released on two independent grounds: first, that his arrest violated the Fourth Amendment because the government had failed to make the required evidentiary showing of probable cause to believe Parretti had committed an extraditable crime; and second, that his detention without bail violated

---

3. Parretti contends that this argument was waived because it was not made until the government filed a Petition for Rehearing following the issuance of our order releasing Parretti. Resp. to Pet. for Reh'g, at 7 n. 6. The government's judicial non-inquiry argument, however, is implicit in the government's theory that a warrant for "provisional arrest" pursuant to an extradition treaty may issue on a showing that the accused is duly charged by the requesting country. This theory was presented to the district court, Resp. to Pet. for Habeas Corpus, at 46; ER at 122, and to the motions panel, Appellee's br. at 36 n. 10. Accordingly, the government's judicial non-inquiry argument is not waived.

4. The district court framed the question raised by this argument by the government as "whether the standard to be applied is probable cause that Parretti will be found extraditable on the French charges, or probable cause that he is guilty of those charges." Findings of Fact, Conclusions of Law & Order Den. Application for Bail & Habeas Corpus Pet., filed Nov. 16, 1995, at 9; ER at exh. 11.

5. Parretti also filed a notice of appeal. After we issued our order that Parretti be released from custody, Parretti moved to consolidate the merits review with the motion proceedings. The government did not oppose the motion to consolidate, and we granted it.

the Due Process Clause of the Fifth Amendment in light of the district court's finding that he was not a flight risk. *United States v. Parretti*, No. 95–56586 (9th Cir. Nov. 21, 1995) (order granting release from custody).[6] We now set forth in greater detail the reasons underlying our original order.[7]

## II

## PROBABLE CAUSE

■ The Warrant Clause of the Fourth Amendment provides: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S.. Const. amend. IV. The Fourth Amendment protects all persons from arbitrary arrests, including persons arrested pursuant to treaties. *Reid v. Covert*, 354 U.S. 1, 16–18, 77 S.Ct. 1222, 1230–31, 1 L.Ed.2d 1148 (1957) (plurality opinion); *In re Aircrash*, 684 F.2d 1301, 1308–09 (9th Cir.1982); *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir.1983) (the "government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution"). Probable cause to arrest exists when there is "evidence that would 'warrant a man of reasonable caution in the belief' that a [crime] has been committed" by the accused. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963). We review de novo whether there was probable cause for the issuance of the warrant for Parretti's arrest. *Ornelas v. United States*, —— U.S. ——, ——, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996); *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir.) (en banc).

## A

### The Rule of Judicial Non–Inquiry

■ Invoking the rule of judicial non-inquiry, the government argues that the warrant for Parretti's arrest should be upheld without an independent judicial determination of probable cause. The government asks us not to "look behind the foreign warrant" for some "factual showing beyond the existence of a foreign charging document setting forth an extraditable offense," Pet. for Reh'g at 9, but to accept the foreign warrant at face value as satisfying the probable cause requirement of the Warrant Clause. As the government puts it, because the treaty at issue here

> authorizes provisional arrest upon information ... of a warrant of arrest[, t]his must be accepted as reflecting a determination by both the Secretary of State and the Congress, which approved the treaty, that France's charging procedures are sufficiently reliable to justify according their warrants faith and credit sufficient to support an arrest and a limited period of detention.

Pet. for reh'g at 8 n. 8.

In arguing that an independent judicial determination of probable cause is not re-

---

**6.** At the time we issued our Order, Parretti had been incarcerated for 33 days. Eight days later, on November 29, 1995, the government filed with the magistrate judge a formal request for Parretti's extradition. *In re Extradition of Parretti*, No. 95–CV–8163 (C.D. Cal. filed Nov. 29, 1995). On May 10, 1996, Parretti appeared at his extradition hearing. *Id.* On May 31, 1996, Parretti was certified extraditable on all charges. *Id.* At that point, the magistrate judge was free to revisit the issue of bail and to make a new determination whether Parretti posed a flight risk. *Id.* (May 31, 1996) (minute order correctly stating that "[t]he Magistrate Judge is of the opinion that the Ninth Circuit's Nov. 21, 1995 Order releasing Mr. Parretti does not preclude committing Mr. Parretti to the custody of the Marshall, to be confined without bail ... now that Mr. Parretti has been determined to be extraditable"). Nonetheless, the magistrate judge released Parretti on bail, with the government's stipulated consent, pending the filing of a petition for a writ of habeas corpus by July 1, 1996.

*Id.* (order staying surrender of Parretti). Parretti filed a petition on July 1, 1996. *See In re Extradition of Parretti*, No. 96–4572–ghksh (C.D.Cal. filed July 1, 1996). Although the parties have not advised us of the status of that related, but separate proceeding, the Central District docket sheet shows that an order was entered on March 12, 1997, dismissing the habeas petition with prejudice on the basis of the fugitive disentitlement doctrine.

**7.** As stated in note 3 *supra*, the government filed a Petition for Rehearing after our order was issued. The government asked us to consider the Petition only if we decided to publish our order or issue a published opinion. Because the government filed the Petition before the filing of this opinion, we denied it without prejudice. Nonetheless, we have considered the arguments raised in the government's Petition for Rehearing and in Parretti's Response thereto.

quired, the government asks us to endorse an unprecedented extension of the rule of judicial non-inquiry to a justiciable case or controversy. Heretofore, the rule of judicial non-inquiry has been applied exclusively to the non-justiciable issues raised by challenges to the general fairness of a requesting nation's legal or penal system, issues that are beyond the purview of Article III judicial power. For instance, we have refused to decide whether the absence of a statute of limitations in Australia violated due process of law. *Kamrin v. United States,* 725 F.2d 1225, 1227–28 (9th Cir.1984). Similarly, in *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983), we affirmed a district court's refusal to decide in an extradition proceeding whether the fugitive would be subjected to brutal and unfair treatment upon her return to the requesting nation, recognizing that "[a]n extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country." [8] *See also Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair."); *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.1980) (refusing to decide whether accused might be tortured or killed if surrendered to the requesting nation because this argument raised an "issue that properly falls within the exclusive purview of the executive branch") (quoting *Sindona v. Grant,* 619 F.2d 167, 174 (2d Cir.1980)); *Garcia–Guillern v. U.S.,* 450 F.2d 1189, 1192 (5th Cir.1971) (refusing to inquire into the procedure that would await accused upon his re-

turn to the requesting nation because "[s]uch matters, so far as they may be pertinent, are left to the State Department, which ultimately will determine whether the [accused] will be surrendered").

In this case, the government invites us to extend the rule of judicial non-inquiry to the paradigmatic justiciable question whether an arrest warrant has been issued in violation of the Fourth Amendment. We respectfully decline the government's invitation. The rule of judicial non-inquiry was not designed to relieve the federal courts of our "unflagging obligation" [9] to decide actual cases or controversies that come before us.

The government cites no case, and we have found none, in which the rule of judicial non-inquiry is invoked to relieve a court of its obligation to decide a justiciable case or controversy. All of the cases cited by the government involve the question of the general fairness of a foreign country's legal and penal systems. *See Glucksman,* 221 U.S. at 512, 31 S.Ct. at 705; *Quinn v. Robinson,* 783 F.2d 776, 789–90 (9th Cir.1986) ("Secretary of State has sole discretion ... to refuse extradition on humanitarian grounds because of the procedures or treatment that await the surrendered fugitive"); *Kamrin,* 725 F.2d at 1228; *Holmes v. Laird,* 459 F.2d 1211, 1219 (D.C.Cir.1972) ("surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American tri-

---

**8.** Although neither our court nor any other has ever denied extradition based on the fugitive's anticipated treatment in the requesting country, we have implicitly suggested the possibility of some judicial inquiry into due process issues by qualifying our determinations of extraditability with the observation that the accused failed to make a showing of possible mistreatment. *See, e.g., Arnbjornsdottir–Mendler,* 721 F.2d at 683 (upholding the accused's extradition "[i]n light of Iceland's outstanding human rights record and [the accused's] uncorroborated prediction or maltreatment"); *Emami v. District Court,* 834 F.2d 1444, 1453 (9th Cir.1987) (rejecting accused's argument that he should not be extradited due to his ill health because court-appointed physician found no serious health condition and requesting country indicated it would provide

adequate medical care). Other courts have also suggested this possibility. *E.g., Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.1960) ("We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the general principle of judicial non-inquiry]."); *see also* Jacques Semmelman, "Federal Courts, the Constitution, and the Rule of Non–Inquiry in International Extradition Proceedings," 76 *Cornell L.Rev.* 1198, 1218 (1991) (citing cases).

**9.** *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 821, 96 S.Ct. 1236, 1248, 47 L.Ed.2d 483 (1976).

als").[10]

In citing these cases, the government overlooks the critical distinction between justiciable and non-justiciable controversies. For example, the government cites *Quinn*, 783 F.2d at 776, but fails to recognize that this distinction is pivotal to *Quinn*'s holding. In *Quinn*, we refused to invoke the rule of judicial non-inquiry because the question presented—the availability of the political offense exception to bar extradition—involves a fact-specific case or controversy typically decided by the courts. We noted that resolution of the political offense question required us to "determine simply whether an uprising was in progress [at the time of the alleged offense]. 'The existence of a violent political uprising is an issue of past fact: either there was demonstrable, violent activity tied to political causes or there was not.'" *Id.* at 788 (internal quotation omitted). In holding that this question, although a difficult one, was capable of resolution by the courts, we said: "[A]s with other complex legal problems, the basic standards that guide us in deciding whether the exception applies are refined on a case-by-case basis as new situations arise.... We fail to see how the judicial construction of [the political offense exception and its] application ... to the facts of a given case, differs from all other judicial decisionmaking." *Id.* at 790. Every other circuit that has addressed the justiciability of the political offense exception has recognized the distinction between the fact-specific inquiry it involves and the generalized policy-like determinations that would be necessary to determine the general fairness of a country's legal and penal systems. For this reason, each of these circuits has held that the questions the political offense exception raises are properly considered by the courts. *E.g., In re Mackin*, 668 F.2d 122, 137 (2d Cir.1981); *Eain v. Wilkes*, 641 F.2d 504, 517 (7th Cir.1981).

Although courts have declined to apply the judicial non-inquiry doctrine to the political offense exception, the doctrine has been invoked to refrain from deciding the question of "subterfuge," i.e., the question whether the motive of a requesting country in seeking extradition is not to prosecute the fugitive for extraditable crimes, but for non-extraditable political crimes. Explaining why courts refrain from deciding the question of "subterfuge" in deference to the Secretary of State, the Seventh Circuit has said: "[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion." *Eain*, 641 F.2d at 516.[11] The Seventh Circuit went on to explain why the doctrine of judicial non-inquiry is invoked in a case involving the subterfuge question but not in a case involving the political offense exception:

> A judicial decision ... that establishes an American position on the honesty and integrity of a requesting foreign government [i.e., whether there is subterfuge] is distinguishable from a judicial determination that certain events occurred and that specific acts of an individual were or were not connected to those events [i.e., whether the political offense exception to extradition applies]. The latter type of decision simply categorizes the facts involved in a given case and then construes the treaty to determine whether or not the facts fall within its ambit. [But] the Judiciary's deference to the Executive on the "subterfuge" question is appropriate since political questions would permeate any judgment on the motivation of a foreign government.

*Eain*, 641 F.2d at 516–17.

■■ In support of its argument that we should invoke the doctrine of judicial non-inquiry and not "look behind the foreign warrant," the government also cites *Michigan v. Doran*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978), which held that an asylum state must give full faith and credit to a requesting state's probable cause determina-

---

**10.** *See also* Semmelman, *supra* note 8, at 1214–21 (citing cases).

**11.** *See also Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971) ("With respect to appellant's contention that upon his return to Peru he will be charged with, and tried for, other crimes distinct and unrelated to the offense with which he is now charged, we are not at liberty to speculate that the Republic of Peru will not recognize and live up to the obligations subsisting between it and the United States.").

tion. In domestic extradition cases, a governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met. *Id.* at 289, 99 S.Ct. at 535–36. *Doran,* however, is inapposite because it is a domestic interstate extradition case and our Constitution requires courts to give full faith and credit to the judicial proceedings of the demanding state. U.S. Const. art. IV, § 2, cl. 2 ("A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."). This constitutional requirement, however, is grounded in the presumption that the judicial proceedings of every state comport with the requirements of the Constitution. *See Doran,* 439 U.S. at 290, 99 S.Ct. at 536 ("Under Art. IV, § 2, the courts of the asylum state are bound to accept the demanding state's judicial determination since the proceedings of the demanding state are clothed with the traditional presumption of regularity."). Because foreign governments are not bound by the Constitution, we decline to invoke the full faith and credit clause of the Constitution to clothe foreign arrest warrants with a presumption of compliance with the Fourth Amendment. Were we to accept the government's invitation to extend the full faith and credit clause in this way, we would be effectively amending Article IV of the Constitution.

It strikes us as curious that the government asks us to give full faith and credit to a foreign charging document at the provisional arrest stage even though we do not give it full faith and credit for probable cause purposes at the extradition hearing stage. At extradition hearings, the committing magistrate is called upon to make an independent determination "whether there is competent evidence to justify holding the accused to await trial." *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). In other words, the committing magistrate must make an independent judicial determination whether a factual basis exists for believing that the accused person committed an extraditable crime. *See, e.g., Glucksman,*

221 U.S. at 512, 31 S.Ct. at 705 ("a man is not to be sent from the country merely upon demand or surmise, ... there [must be] presented ... such reasonable ground to suppose him guilty as to make it proper that he be should be tried"); *Quinn,* 783 F.2d at 783 (under doctrine of dual criminality, an accused person can be extradited only if there is evidence that would justify committing the accused for trial under the law of the nation requesting extradition if the offense had been committed within the territory of that nation); 18 U.S.C. § 3184 (before an accused may be certified extraditable, court must hear evidence of criminality and determine whether it suffices to sustain the charge under the provisions of the treaty). Just as we do not accept the foreign charging document as a substitute for the customary showing of probable cause at the extradition hearing, we see no reason to accept it as a substitute for a judicial determination of probable cause at the provisional arrest stage.

In sum, we reject the government's notion that our courts should invoke the rule of judicial non-inquiry to abstain from deciding whether the warrant for Parretti's arrest was based upon competent evidence that he committed an extraditable crime. "We fail to see how [the question whether the warrant for Parretti's arrest was issued in violation of the Fourth Amendment] differs from all other judicial decisionmaking." *Quinn,* 783 F.2d at 790.

#### B

#### The Government's Theory of a "Provisional Arrest" Exception to the Warrant Clause

We now turn to the merits of the government's argument that the Fourth Amendment permits an arrest warrant to be issued on the basis of a foreign arrest warrant by a treaty partner, without an independent judicial determination of probable cause based upon competent evidence. This argument raises a constitutional question of first impression: May a person be "provisionally arrested" and held for 40 days on a showing that the person has been charged by a foreign government with having committed an

extraditable crime? In other words, may a warrant for provisional arrest issue without an evidentiary showing of probable cause to believe an extraditable crime has been committed?

Although we know of no case in which this question has been decided, the Second Circuit has raised "grave questions concerning the constitutional propriety" of issuing an arrest warrant solely on the basis of the existence of a foreign arrest warrant. *Caltagirone v. Grant*, 629 F.2d 739, 748 (2d Cir. 1980); *see also United States v. Williams*, 480 F.Supp. 482, 485 (D.Mass.) (expressing doubt as to constitutionality of 30–day provisional detention based solely on information that the fugitive had been charged with an extraditable crime), *rev'd on other grounds*, 611 F.2d 914 (1st Cir.1979).

### 1. *The necessity of deciding the Fourth Amendment question.*

In *Caltagirone*, the Second Circuit avoided the constitutional question by interpreting the treaty with Italy as requiring a full evidentiary showing of probable cause to believe that an extraditable crime had been committed, and then holding that the warrant for Caltagirone's "provisional arrest," which was issued solely on the basis of the existence of an Italian arrest warrant, violated the treaty because it was issued without probable cause. *Caltagirone*, 629 F.2d at 742, 747 ("The overwhelming evidence that Article XIII [of the treaty] itself prohibits provisional arrest without probable cause relieves us of the need to examine the constitutional propriety of a treaty that purports to permit such arrests.").

The language in the Italian treaty that the Second Circuit interpreted as requiring probable cause for a provisional arrest warrant was the following:

"In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. . . . The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a war-

rant of arrest . . . against that person, *and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed . . . in the territory of the requested Party*"

*Caltagirone*, 629 F.2d at 744 n. 9 (quoting Treaty of Extradition, Jan. 18, 1973, U.S.–Italy, 26 U.S.T. 493) (emphasis added). In other words, the Italian treaty provided for the issuance of a warrant for "provisional arrest" only upon a showing of both the existence of an arrest warrant *and* "such further information as would be necessary to justify the issue of the warrant of arrest had the offense been committed" in the United States. *Id.* at 745. The Second Circuit interpreted this "further information" language as requiring a showing of probable cause in addition to the existence of an arrest warrant issued by the requesting state. *Id.* at 744 ("Had the offense [the fugitive was charged with] been committed in the United States, a showing of probable cause would have been necessary to justify the issuance of an arrest warrant.").

Because similar "further information" language was also included in the extradition treaty with Spain at issue in *Sahagian*, the Seventh Circuit was also able to avoid the Fourth Amendment question. Article XI of the treaty with Spain provided:

"In case of urgency a Contracting Party may apply to the other Contracting Party for the provisional arrest of the person sought. . . . The application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest . . . *and such further information, if any, as may be required by the requested Party*."

*Sahagian v. U.S.*, 864 F.2d 509, 511 (7th Cir.1988) (emphasis added). As the Second Circuit had done in *Caltagirone*, the Seventh Circuit interpreted the "further information" language in the treaty with Spain as requiring a showing of probable cause for the issuance of a warrant for provisional arrest in addition to the existence of the Spanish arrest warrant. *Id.* at 513 ("As contemplated by Article XI [of the Spanish treaty], the

federal officials obtained Sahagian's provisional arrest and detention pending extradition after obtaining an arrest warrant from a magistrate based upon a showing of probable cause."). In this way, the Seventh Circuit also avoided the Fourth Amendment question. *Id.* ("the procedures set forth in Article XI did not deprive Sahagian of any constitutional rights").

█ In keeping with time-honored precepts of judicial restraint,[12] we too could avoid the constitutional question raised by the government's argument if the treaty with France, like the treaty with Italy considered in *Caltagirone* and the treaty with Spain considered in *Sahagian,* could fairly be interpreted as requiring a showing of probable cause in addition to the existence of a foreign arrest warrant. However, neither the article authorizing provisional arrests, nor any other provision of the French treaty can fairly be so interpreted.

> Article IV of the French treaty provides:
> The arrest and detention of a fugitive may be applied for on information, even by telegraph, of the existence of a judgment of conviction *or* of a warrant of arrest.
> . . .
> . . . [I]n case of urgency, the application for arrest and detention may be addressed directly to the competent magistrate in conformity to the statutes in force.
> . . . [T]he person provisionally arrested shall be released, unless within forty days . . . from the date of commitment in the United States, the formal requisition for surrender with the documentary proofs herein before prescribed be made as aforesaid by the diplomatic agent of the de-

manding government or, in his absence, by a consular officer thereof.

Extradition Treaty, Jan. 6, 1909, U.S.–Fr., art. IV, 22 U.S.T. 407, *as amended,* Feb. 12, 1970, T.I.A.S. 7075 (emphasis added). Thus, in stark contrast to the treaties with Italy and Spain, Article IV of the treaty with France contains no "further information" requirement, nor any other language that might fairly be interpreted as requiring a showing of probable cause as required by the Fourth Amendment. The language of Article IV unambiguously permits the issuance of an arrest warrant solely on the basis of the existence of a foreign warrant of arrest.

The only other language of the French treaty that pertains to the arrest of fugitives, found in Article I,[13] also cannot fairly be interpreted as requiring probable cause for provisional arrests. Article I governs when the United States and France must "deliver up" fugitives to each other. "Deliver up" plainly means the actual act of surrendering the fugitive, and Article I's requirement of a showing of probable cause simply embodies the well-established principle that the committing magistrate must make an independent determination of probable cause before a person may be extradited. *See* 18 U.S.C. § 3184 (court must hear and consider evidence of criminality before fugitive may be certified extraditable); *Collins v. Loisel,* 259 U.S. 309, 314–15, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922); *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).

█ We could also avoid reaching the Fourth Amendment question by interpreting

---

12. *See, e.g., Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932)).

13. Article I provides:
The Government of the United States and the Government of France mutually agree to deliver up persons who, having been charged with

or convicted of any of the crimes or offences specified in the following article, committed within the jurisdiction of one of the contracting Parties, shall seek an asylum or be found within the territories of the other: Provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offence had been there committed.
Extradition Treaty, Jan. 6, 1909, U.S.–Fr., art. I, 22 U.S.T. 407, *as amended,* Feb. 12, 1970, T.I.A.S. No. 7075.

18 U.S.C. § 3184,[14] which authorizes the issuance of arrest warrants pursuant to extradition treaties, as requiring a traditional showing of probable cause. Unfortunately, like the French treaty, § 3184 cannot fairly be so read. Section 3184 allows an arrest warrant to issue on the basis of a "complaint ... charging [the person to be arrested] with having committed" an extraditable offense. Once again, all § 3184 requires is a showing that the fugitive has been *charged* with committing an extraditable crime. Section 3184 does not require an independent judicial determination of probable cause to believe the fugitive committed the offense. Under § 3184, the purpose of the arrest is to allow the fugitive to be brought before a magistrate so that the "evidence of criminality may [then] be heard and considered." In other words, § 3184 contemplates an arrest so that *thereafter,* at the extradition hearing, the "evidence of criminality," i.e., the existence of probable cause, may be heard.

In sum, neither the treaty with France nor § 3184 can fairly be construed as requiring a traditional showing of probable cause for the issuance of a warrant for provisional arrest. Nor can we avoid the Fourth Amendment question presented by Parretti's appeal by finding that a showing of probable cause has in fact been made. *See In re Russell,* 805 F.2d 1215, 1217 (5th Cir.1986) ("Assuming without deciding that the Treaty requires a showing of probable cause to support a provi-

sional arrest ... we agree with the district court that the magistrate had enough evidence before him to show probable cause to detain [the fugitive].").[15] Just as in *Caltagirone,* 629 F.2d at 742–43, the government, in relying solely on the existence of the French arrest warrant, has failed to satisfy the probable cause requirement of the Warrant Clause of the Fourth Amendment. *See* Part II–C *infra.*

We are therefore obligated to reach the constitutional question that the Second, Fifth, and Seventh Circuits managed to avoid in *Caltagirone, Russell,* and *Sahagian.* Parretti's appeal squarely presents the question whether the Fourth Amendment permits the issuance of a warrant for a "provisional arrest" based solely on the "existence of a warrant of arrest" (as the French treaty puts it) issued by a treaty partner.

### 2. The merits of the Fourth Amendment question.

■ We now turn to the merits of the government's argument that an arrest warrant may be issued in compliance with the Fourth Amendment solely on the basis of the existence of an arrest warrant issued by a treaty partner charging the fugitive with having committed extraditable crimes. Although the Second Circuit avoided the constitutional question that now confronts us, it nonetheless expressed "grave" concerns

**14.** Section 3184 provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, ... any judge ... may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of an any such foreign government any of the crimes provided for by such treaty or convention ... issue his warrant for the apprehension of the person so charged, that he may be brought before such ... judge ... to the end that the evidence of criminality may be heard and considered.... If on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention ... he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the

> stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.
>
> 18 U.S.C. § 3184.
>
> Article IV of the treaty provides in pertinent part:
>
> In the United States, the application for arrest and detention shall be addressed to the Secretary of State, who shall deliver a warrant certifying that the application is regularly made and requesting the competent authorities to take action thereon *in conformity to statute.*
>
> Extradition Treaty, Jan. 6, 1909, U.S.–Fr., art. IV, 22 U.S.T. 407, *as amended,* Feb. 12, 1970, T.I.A.S. 7075 (emphasis added).

**15.** *See also Spatola v. United States,* 741 F.Supp. 362, 366 (E.D.N.Y.1990) (noting that magistrate had avoided the constitutional question raised by defendant's Fourth Amendment challenge to the warrant for his "provisional arrest" by finding probable cause).

about substituting a foreign arrest warrant *charging* a fugitive with a crime for an independent judicial determination of probable cause to believe the fugitive had *committed* the crime. *Caltagirone,* 629 F.2d at 748. Undaunted by the concerns expressed not only in *Caltagirone,* but in *Sahagian* and *Russell* as well, the government once again presses its argument that a fugitive may be "provisionally arrested" and detained for up to 40 days without an evidentiary showing of probable cause.[16]

The government fails to give us any cogent reason why the Fourth Amendment should be interpreted to allow the arrest of an individual "provisionally" for 40 days for treaty enforcement purposes without the customary judicial determination of probable cause based upon competent evidence. The only reason the government offers for treating such "provisional" arrests differently from all other arrests is the "limited purpose of provisional arrest, which is to hold an individual charged with extraditable foreign crimes for the limited time (here 40 days) granted the foreign government under the applicable treaty to gather and transmit the evidence required for extradition." Pet. for Reh'g at 7.

We cannot accept the government's argument. To repeat, the Warrant Clause states, "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. Const. amend. IV. The clarity of this language allows for no exceptions, regardless whether the government's purpose in making the arrest is to enforce treaties or our own domestic laws. *See Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, ——, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995) ("Warrants cannot be issued, of course, without the showing of probable cause required by the Warrant Clause."). When a person is arrested and detained, he is deprived of his

most precious liberty, freedom from restraint by the government. *See Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1785–86, 118 L.Ed.2d 437 (1992) (freedom from bodily restraint is at the "core" of liberty). The severity of that deprivation does not vary with the government's purpose in making the arrest. Even if it did, the command of the Warrant Clause that *no* warrant issue but on probable cause is immutable.

Thus, we must reject the government's invitation to carve out an exception to the probable cause requirement of the Warrant Clause for "provisional arrests" pursuant to treaties. As noted above (*supra* at 1366), the Bill of Rights limits the actions of government taken pursuant to treaties as well as statutes. The Warrant Clause cannot be interpreted as allowing a lesser standard for arrests made for the purpose of enforcing treaty obligations than for arrests made for the purpose of enforcing our own domestic laws. It speaks of probable cause as a necessary condition of every arrest warrant, regardless of the governmental purpose served by the arrest. And it could be no other way.

As authority for the proposition that a warrant for a "provisional arrest" may issue without an independent judicial determination of probable cause, the government cites *United States ex rel. Petrushansky v. Marasco,* 325 F.2d 562, 564 (2d Cir.1963). We find *Marasco* to be unpersuasive authority for three reasons. First, *Marasco* did not address the constitutionality of the government's position. It simply held, citing *Fernandez v. Phillips,* 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925), that a warrant for a "provisional arrest" could be issued on the basis of a complaint alleging that Marasco was charged with murder in Mexico. Second, *Marasco*'s reliance on *Fernandez* was misplaced. In *Fernandez,* the arrest war-

---

**16.** In *Caltagirone,* the Second Circuit warned that a fugitive could, in fact, be detained indefinitely without an independent judicial determination of probable cause because the requesting country could renew over and over again its request for provisional arrest based solely on the existence of the foreign arrest warrant:

> In *Collins v. Loisel,* the Supreme Court held that an extradition proceeding which ends in the relator's release from custody does not bar

a subsequent extradition demand by the requesting state on the same charge.... [I]n the Government's view, a foreign state could apply for, and the Government could effect, the unlimited detention of Caltagirone by stringing together an infinite strand of forty-five day provisional arrests, all without a judicial determination of probable cause....

*Caltagirone,* 629 F.2d at 747–48 (citation omitted).

rant was issued on the basis of an abundance of evidence that the fugitive had committed an extraditable offense. 268 U.S. at 313, 45 S.Ct. at 543 (complaint included a "copy of the proceedings in the [foreign] court finding that the crime was duly proved against the appellant and ordering his arrest, many pages of *evidence* being appended") (emphasis added). Moreover, as the Second Circuit itself pointed out in *Caltagirone, Marasco* cannot be understood to have resolved the constitutional question because, not only does "the Fourth Amendment point seem[ ] not to have been raised [in *Marasco* ]," but "evidence establishing probable cause was produced." *Caltagirone,* 629 F.2d at 748 n. 19. Finally, in *Caltagirone,* the Second Circuit expressly declined to read *Marasco* in the way the government would have us read it— as authority for the proposition that a "provisional arrest" warrant may be based on less than full probable cause. *Id.*

The only other case the government cites for the proposition that a warrant for provisional arrest may rest solely on the existence of a foreign arrest warrant is *United States v. Wiebe,* 733 F.2d 549, 553–54 (8th Cir.1984). In *Wiebe,* the Eighth Circuit plainly and correctly stated that a judicial determination of probable cause to believe the fugitive *committed* an extraditable crime was required for a provisional arrest warrant. *Id.* at 554 ("A magistrate may issue a provisional arrest warrant upon a showing in a sworn complaint of a treaty of extradition between the United States and any foreign country, and that the person sought *committed* in the foreign jurisdiction one of the crimes set forth in the treaty.") (emphasis added). The *Wiebe* court, however, then went astray and inexplicably upheld a warrant even though it was based on a complaint that alleged only that Wiebe was *charged* with an extraditable crime. In any event, to the extent that *Wiebe* may be read as supporting the government's argument, we decline to follow it.

The government also advances a practical reason for permitting "provisional arrest" warrants to be issued without probable cause. To require it to make a full showing of probable cause for a "provisional arrest," says the government, would be to require

"the complete extradition showing" at the provisional arrest stage, which would make the later extradition hearing redundant. There is no merit to this argument. We agree with the Second Circuit that "though the provisional arrest and extradition proceedings must differ in some way, the difference does not lie in the requirement of probable cause." *Caltagirone,* 629 F.2d at 747. The difference lies in the fact that before extraditability may be certified, the fugitive is entitled to a hearing, 18 U.S.C. § 3184, at which he may introduce evidence and raise certain affirmative defenses, for instance that the crime charged is a non-extraditable "political offense." *See Charlton v. Kelly,* 229 U.S. 447, 461–62, 33 S.Ct. 945, 949–50, 57 L.Ed. 1274 (1913); M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 545 (2d rev. ed. 1987) (listing judicial determinations to be made at extradition hearing).

The government also argues that to require a showing of probable cause for the issuance of a "provisional arrest" warrant would create a "practical impossibility." because in many cases "the arrest must be arranged with haste to avoid further flight." Appellee's Br. at 36 n. 10. The result, the government argues, would "ensure[ ] that in some instances fugitives discovered in the United States will be able to flee before the foreign country can prepare that evidentiary showing [of probable cause]." Pet. for Reh'g at 11. The government claims that such a requirement would be "logically inconsistent with the limited purpose of provisional arrest, which is simply to hold an individual charged with extraditable foreign crimes for the limited time (here 40 days) granted the foreign government under the applicable treaty to gather and transmit the evidence required for extradition." *Id.* at 7. This argument is also devoid of merit. First, there is language contained in the extradition treaties with Spain and Italy, but not contained in the treaty with France, that requires full compliance with the probable cause requirement of the Warrant Clause of the Fourth Amendment. *See* Part II–B–1 *supra.* The fact that the government willingly included language requiring probable cause in other extradition treaties belies its

claim of "practical impossibility" under the French treaty. Second, the hurdles created by the Fourth Amendment in the path of treaty enforcement are no different from the hurdles created for our own law enforcement officers, who are required to marshal evidence of probable cause and present it to a magistrate no later than 48 hours after a warrantless arrest is made based upon exigency. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991).

In the final analysis, the government is really arguing that its interests in extradition cases are greater than its interests in domestic law enforcement.[17] It asks us to do something in the former that we may not do in the latter: issue an arrest warrant without probable cause. The clear and emphatic command of the Warrant Clause—*"[N]o War-rants shall issue, but upon probable cause, supported by Oath or affirmation ...."*—bars the issuance of a warrant without probable cause. The Warrant Clause does not permit the issuance of a warrant based on a determination that the government's interests in making the arrest outweigh the liberty interests of the arrestee. Even in the exceptional case of *Terry v. Ohio,* where the Court substituted a balancing test for the probable cause requirement of the Fourth Amendment, the Court took pains to explain that the case did not involve "police conduct subject to the Warrant Clause of the Fourth Amendment." 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

In conclusion, we hold that Article IV of the extradition treaty with France violates the Fourth Amendment because it provides for the issuance of "provisional arrest" warrants without independent judicial determinations of probable cause to believe the fugitive committed the offenses charged.[18] We also hold that 18 U.S.C. § 3184 violates the Fourth Amendment to the extent it authorizes the issuance of "provisional arrest" warrants without independent judicial determinations of probable cause. We reject the government's argument that a warrant for "provisional arrest" made pursuant to treaty may be constitutionally issued on the existence of a foreign arrest warrant charging the fugitive with having committed extraditable crimes, unsupported by competent evidence of probable cause.

### C

### The Government's Probable Cause Showing

 Parretti argues that the warrant for his arrest was issued on the basis of no evidence whatsoever. He contends that it was issued solely on the basis of the allegations of fact contained in the French arrest warrant, and that allegations are not evidence.[19] Parretti asserts that "there is no

---

17. We note that the interest asserted by the government as a justification for not requiring an evidentiary showing of probable cause as a basis for a provisional arrest warrant has been described as "tenuous" by the only court previously to have considered it. *Caltagirone,* 629 F.2d at 748 ("We doubt that the tenuous relationship between an application for provisional arrest and a subsequent request for extradition implicates a sufficiently strong foreign policy interest in the executive to justify such a departure from usual Fourth Amendment protections.") (footnote omitted). Like the treaty with Italy considered in *Caltagirone,* the treaty with France does not require that a request for provisional arrest be followed by a formal request for extradition. At the time Parretti was arrested for up to 40 days, France had not yet requested his extradition and may never have done so.

18. Parretti also argues that his arrest was invalid because 18 U.S.C. § 3184 is an unconstitutional violation of the separation of powers doctrine. His argument is based on the reasoning in *Lobue*

*v. Christopher,* 893 F.Supp. 65 (D.D.C.1995), *vacated on jurisdictional grounds,* 82 F.3d 1081 (D.C.Cir.1996). According to Parretti, § 3184 authorizes the executive branch to review the courts' legal determinations of extraditability and, through the Secretary of State's decision whether or not to surrender fugitives, in effect to affirm or reverse decisions made by the judiciary. The government responds that § 3184 establishes a "dual key" scheme, whereby the courts determine whether it is lawful for the Executive branch to surrender the fugitive, and then the Secretary of State decides—in light of a wide range of foreign policy concerns—whether to exercise his discretion to proceed with the surrender. We need not decide the question whether § 3184 violates the separation of powers doctrine because we invalidate the warrant for Parretti's arrest on the ground that it violated the Fourth Amendment.

19. Parretti argues that even if the allegations had been backed up by trustworthy evidence, they could not establish probable cause because (1)

indication at all as to the actual source of the information that is presented," and "without some indication as to the underlying source of the information, there can be no determination of probable cause ... because the judicial officer cannot assess the reliability of the information and there is no corroboration presented to establish reliability." Appellant's Brief at 22–23.

In response, the government contends that the French official should be presumed to be reliable and that his reliability cloaks his allegations of fact with sufficient credibility to establish probable cause, even in the absence of any showing of a basis for crediting whatever evidence he relied upon.

 The question, however, is not whether we are willing to defer to the Secretary of State's judgment that the French investigating magistrate is reliable. The question is whether the government has made the evidentiary showing of probable cause required by the Fourth Amendment. Indeed, the government's argument to the contrary seems to amount to a suggestion that Congress has done the courts' work for us: *Congress* has provided in § 3184 that a showing that the fugitive has been charged by a treaty partner with an extraditable crime satisfies the Fourth Amendment. The government argues, in other words, that since Congress has determined the charging document to be sufficient evidence of probable cause as a matter of law, there is nothing left for the courts to

decide. But Congress has no power to prescribe a rule of decision directing the outcome of a case or controversy. Since *U.S. v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), it has been firmly established that the principle of separation of powers forbids Congress to "prescribe a rule for the decision of a cause" or to deny to a court its prerogative to "give the effect to evidence which, in its own judgment, such evidence should have." *Id.* at 146, 147. It is for the courts, not Congress, to determine when the Fourth Amendment's probable cause requirement is satisfied.[20]

Turning to that inquiry, we agree with Parretti that the government failed to make the evidentiary showing required to obtain a warrant for his arrest. In applying for the warrant to arrest Parretti, all the government presented were the French magistrate's allegations of fact. According to the information and belief allegations of the AUSA's Complaint, the facts alleged in the French arrest warrant were obtained from "investigations" by unidentified French authorities and from unidentified experts, shareholders, and employees of EID. Complaint ¶¶ 5(g)(3), 5(h)(3), 5(k). The government presented no affidavits, deposition testimony, or other competent evidence that could have provided Judge Reichmann with a " 'substantial basis for ... concluding' that probable cause exist[s]." *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332.[21]

"there is no conduct by Mr. Parretti that is even alleged in the complaint," Appellant's Brief at 22, and (2) the allegations do not establish that extraditable crimes have been committed, either because the facts as alleged do not amount to criminal conduct or because the offenses charged do not meet the dual criminality requirement for extradition. We need not reach these arguments because we hold that the government has not satisfied the evidentiary requirements for a determination of probable cause.

**20.** Ordinarily, when a court asks whether a statute has run afoul of the *Klein* doctrine, it must conduct another, complementary inquiry and ask whether Congress has merely effected a change to the law that underlies the dispute in question, rather than attempting to prescribe a rule of decision for that dispute. *See Pennsylvania v. Wheeling Bridge Company*, 59 U.S. (18 How.) 421, 429–30, 15 L.Ed. 435 (1855); *Klein*, 80 U.S. (13 Wall.) at 147 (discussing *Wheeling Bridge*,

distinguishing unconstitutional attempt to prescribe rule of decision from situation where "new circumstances have been created by legislation"). In this case, however, such an inquiry is unnecessary. Congress has no power to modify the Fourth Amendment by legislative action.

**21.** *See also Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963) (to obtain an arrest warrant, the government must establish probable cause on the basis of *"evidence* that would 'warrant a man of reasonable caution in the belief' that a [crime] has been committed") (emphasis added) (citation omitted); *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881–82, 18 L.Ed.2d 1040 (1967) ("Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has

In sum, Parretti is correct that the government's probable cause showing consisted of nothing more than naked allegations. They may have been relayed to the State Department by a reliable source, but those allegations without supporting affidavits or other competent evidence provide no basis for a judicial determination whether there is probable cause to believe Parretti committed an extraditable crime. In essence, the government is asking us to equate the existence of a foreign arrest warrant with a showing of probable cause. Like the Second Circuit in *Caltagirone*, we decline to do so. *See Caltagirone*, 629 F.2d at 744 (reversing the district court, which "simply noted that an Italian warrant of arrest was outstanding [and] saw no need to determine whether a sufficient showing had been made to support an arrest under United States law").

The government next argues that, even if the fact that Parretti was duly charged by France with extraditable crimes is insufficient to establish probable cause, the foreign official's "determinations of fact" should be considered sufficient because warrants for "provisional arrest" may be based on facts reported on information and belief without supporting affidavits, deposition testimony, or other competent evidence. Pet. for Reh'g at 9. The government's reliance on *Yordi v. Nolte*, 215 U.S. 227, 30 S.Ct. 90, 54 L.Ed. 170 (1909), for this proposition is misplaced. In *Yordi*, which upheld an arrest and warrant of extradition, the magistrate had before him ample evidence consisting of the record of the foreign judicial proceedings that had resulted in the foreign warrant for Yordi's arrest, "including the testimony of witnesses." *Yordi*, 215 U.S. at 229–30, 30 S.Ct. at 91. Thus the magistrate was able to determine that "the prosecution against the accused was based upon real grounds, and not upon

mere suspicion of guilt...." *Id.* at 230, 30 S.Ct. at 91.

It is true, as the government says, that the *Yordi* Court rejected the argument that an extradition complaint must be sworn to by persons having personal knowledge of the facts alleged. However, the Court did so in order to acknowledge that evidence used to support probable cause findings could take the form of "depositions, warrants, or other papers offered in evidence, ... if they shall be properly and legally authenticated so as to entitle them to be received as evidence of the criminality of the person so apprehended, by the tribunals of the foreign country...." *Yordi*, 215 U.S. at 231, 30 S.Ct. at 92 (quoting *Rice v. Ames*, 180 U.S. 371, 375, 21 S.Ct. 406, 407–08, 45 L.Ed. 577 (1901)).

The government's reliance on *In re Russell*, 805 F.2d 1215 (5th Cir.1986), for the proposition that a warrant for "provisional arrest" may be issued on the basis of information and belief allegations unsupported by evidence, is also misplaced. In *Russell*, the magistrate who issued the arrest warrant had before him sworn testimony from Russell himself admitting that he had participated in the criminal transaction. *Russell*, 805 F.2d at 1217–18.

The government quotes dicta in *Russell* that "several cases have approved the use of a complaint based on information and belief rather than personal knowledge." 805 F.2d at 1217. *Russell*, however, miscites the two cases it relies on for this dicta. One is *Yordi*, 215 U.S. at 227, 30 S.Ct. at 90 which we discussed above. The other is *Grin v. Shine*, 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902). Although *Grin v. Shine* states that "[a]ll that is required [in extradition proceedings] is that a complaint shall be made under

been or is being committed."); *Rugendorf v. United States*, 376 U.S. 528, 530, 84 S.Ct. 825, 826–27, 11 L.Ed.2d 887 (1964) (upholding probable cause determination when the hearsay-declarant stated that he personally knew that the informant had supplied reliable information in the past and the information provided by the informant was corroborated by information discovered by the affiant and other information known to the hearsay-declarant); *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (probable cause established

to arrest suspect when affiant had personal knowledge that informant had been reliable in the past and had personally verified every facet of the tip except for whether the suspect had accomplished his criminal purpose); *Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958) (no probable cause when "complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein [and does not] indicate[] any sources for the complainant's belief").

oath," it goes on to explain that the complaint "may be made by any person ... having knowledge of the facts, or, in the absence of such person, by the official representative of the foreign government based upon depositions in his possession...." *Grin v. Shine*, 187 U.S. at 193, 23 S.Ct. at 103.

In citing these cases for the proposition that probable cause was established by the AUSA's information and belief allegations about allegations contained in the French arrest warrant, the government effectively returns to the theory that lies at the core of its argument: that the Fourth Amendment allows a warrant for a "provisional arrest" to be issued for treaty purposes without an evidentiary showing of probable cause. As we said in Part II–B *supra*, the Warrant Clause of the Fourth Amendment allows for no variation in the probable cause standard

depending upon the government's purpose served by making the arrest.

In sum, the warrant for Parretti's arrest was issued in violation of the Fourth Amendment because the government failed to make the necessary evidentiary showing of probable cause to believe that Parretti had committed an extraditable offense.

## III

## DUE PROCESS

■ We now turn to the question whether the detention of Parretti without bail prior to his extradition hearing deprived him of liberty in violation of the Fifth Amendment. The district court denied bail even though the court refused to find that Parretti posed a risk of flight. Reporter's Tr. of Proc'gs, Nov. 9, 1995 ("I can't say he's a flight risk.... I don't see him as a flight risk.").[22]

22. Later, after he was convicted on state charges in Delaware, Parretti fled that jurisdiction while on bail pending his sentencing hearing. *See A Financier Flees Before Court Date*, N.Y. Times, Jan. 4, 1997, at 25. His flight after conviction in Delaware has no bearing, of course, on the question whether the district court's earlier finding that he was not a flight risk pending a possible extradition hearing was clearly erroneous. Based upon the evidence before it at the time, the district court made that finding prior to receiving a request for Parretti's extradition, or the holding of any extradition hearing. Although Parretti was an international businessman with only marginal personal ties to the United States, faced serious charges in France if the United States were to extradite him, and was under criminal investigation by both the FBI and the IRS, the district court could have concluded that he was not a flight risk and that bail in a sufficiently high amount would secure his appearance, given that he had willingly appeared in Delaware court after he was released on bail before trial, he had complied fully with the INS conditions imposed upon his entry into the United States, he had complied fully with the conditions imposed by the Italian court while he was in both the United States and Italy, and he had strong business, if not personal, ties to the United States, including being a plaintiff in a major civil action. Indeed, he was in Los Angeles having his deposition taken in the offices of White & Case when he was arrested. See *supra* page 1365. The district court's finding that he was not a flight risk was nothing more, of course, than an assessment of the probabilities that he would not flee before his extradition hearing. It was not, and could not have been, an absolute guarantee that he would appear at his extradition

hearing if released on bail. The finding proved to be reliable: He remained in Los Angeles and appeared at his extradition hearing. The fact that he later fled, after he was convicted in Delaware, does not alter the reliability of the district court's prediction that he would appear at his extradition hearing.

In his dissent, Judge Pregerson maintains that we should invoke the fugitive disentitlement doctrine to dismiss the appeal because Parretti has fled the country. That doctrine is discretionary, so we are not obliged to raise the issue *sua sponte*. See *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1054–55 (9th Cir.1991) ("[W]hile we clearly have the discretionary authority to dismiss this appeal, there is 'no *per se* requirement of dismissal in [these] ... case[s].' *Hussein v. INS*, 817 F.2d 63, 63 (9th Cir.1986) (Norris, J., concurring)"). In the circumstances of this case, we see no reason to decide the issue *sua sponte*. For present purposes, we need briefly note only two points. First, Parretti is not seeking further relief from this court, and the relief we previously provided is of no further benefit to him. We are simply issuing an opinion explaining our earlier action, as we promised to do in the order we issued prior to his flight. We believe that the government and the district court, among others, are entitled to that explanation. This is particularly so in a case of the type before us—a pretrial or pre-extradition hearing bail matter, where the issue frequently becomes moot (for practical purposes, at least) before the full range of appellate procedures can be exhausted by the parties. Second, we are not persuaded by Judge Pregerson's reason for dismissing the appeal: that Parretti's continued participation in the litigation is necessary. Judge Pregerson relies on a dissent by Justice Stevens saying that, even

In denying Parretti bail even though he was not a flight risk, the district court relied on its finding that Parretti had failed to establish "special circumstances" warranting bail. *See United States v. Smyth (In re Requested Extradition of Smyth)*, 976 F.2d 1535, 1536 (9th Cir.1992) (denying bail to potential extraditee who was not a flight risk for failure to show "special circumstances"); *see also United States v. Kirby (In re Requested Extradition of Kirby)*, 106 F.3d 855, 864–65 (9th Cir.1997) (as amended) (following *Smyth* ). Parretti argued that there were four special circumstances in his case: (1) he was not likely to be found extraditable; (2) his continued detention interfered with his participation in his civil suits and (3) with his health; and (4) France had not sought his extradition from Italy. Memorandum in support of Application for Review of Magistrate Judge's Denial of Bail, dated Nov. 6, 1995, at 26–32; ER 69–74. The district court found that Parretti had not established any of the first three asserted special circumstances, and held that the fact that France had not requested Parretti's extradition from Italy was not a special circumstance as a matter of law.

On appeal, Parretti argues that the district court abused its discretion when it found that Parretti was likely to be found extraditable and that his continued detention was not interfering with his participation in his civil lawsuits.[23] Parretti also renews his argument that France's failure to request Parretti's extradition from Italy is a special circumstance because it demonstrates that the predicate justifying the 40 day detention— that this period is necessary for the requesting country to assemble the documentation required to make a formal extradition request—is not present. The government asserts that the Complaint itself establishes the probable cause necessary to find Parretti extraditable, and points to Judge Reichmann's statement that, if necessary, he would intervene to ensure that the Board of Prisons facilitated Parretti's participation in his civil litigation during his incarceration. France's decision not to seek Parretti's extradition from Italy is, the government argues, irrelevant to the question of Parretti's eligibility for bail.

We review the district court's determination that special circumstances do not exist for abuse of discretion, *see Smyth*, 976 F.2d at 1535, and hold that the district court did not abuse its discretion in determining that Parretti had not established special circumstances warranting his admission to bail. We also agree with the district court that the fact that France did not seek Parretti's extradition from Italy was not a special circumstance as a matter of law. We therefore confront Parretti's argument that his detention without bail deprived him of his personal liberty without due process of law in violation of the Fifth Amendment because he posed no risk of flight or danger to the community.

## A

### *Wright v. Henkel* and its Progeny as Precedent

Parretti argues that, notwithstanding the "special circumstances" doctrine, it remains an open question whether denying release on bail in the absence of a finding of flight risk or danger to the community violates due process because no case applying the "special circumstances" standard has ever addressed, let alone decided, this constitutional question. The government, appar-

though a case is not technically moot, the escape of a defendant "may compromise the adversary character of the litigation" because the escapee's attorney may have "less than zealous" "desire to vindicate a faithless client." *United States v. Sharpe*, 470 U.S. 675, 724, 105 S.Ct. 1568, 1595, 84 L.Ed.2d 605 (1985) (Stevens, J., dissenting). The Court, however, did not share Justice Stevens' concern about compromising the adversarial character of the litigation. *Id.* at 681 n. 2, 105 S.Ct. at 1573 n. 2 (opinion of the Court). Instead, the Court resolved any such concerns in *Sharpe* by directing counsel for the fugitives to file a brief as *amicus curiae* in support of their

absent clients' position. *Id.* We see no reason why we should not follow the Supreme Court's lead and, should further briefing prove necessary, direct Parretti's able counsel to file an *amicus* brief. Indeed, despite Parretti's absence from the country, his counsel submitted a brief on the fugitive disentitlement doctrine when requested to do so by the district court in his related, but separate habeas proceeding.

23. Parretti does not challenge the district court's finding that he had not established the special circumstance of deteriorating medical health due to incarceration.

ently conceding that no court has ever discussed or even alluded to the due process question, responds that *Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903), and its progeny [24] have held *sub silentio* that the "special circumstances" standard is constitutional by repeatedly applying it to deny bail in extradition cases. Specifically, the government contends that "it cannot be presumed that this court's and the Supreme Court's earlier decisions ignored due process concerns in adopting and applying the 'special circumstances' standard." Pet. for Reh'g at 12. Not surprisingly, the government cites no authority in support of this startling proposition.

It is a time-honored principle of *stare decisis* that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) ("Even as to our own judicial power or jurisdiction, this Court has followed the lead of Mr. Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*."); *United States v. More*, 7 U.S. (3 Cranch) 159, 172, 2 L.Ed. 397 (1805) (statement of Marshall, C. J., as reported in the arguments of counsel) ("No question was made, in that case, as to the jurisdiction. It passed *sub silentio*, and the court does not consider itself as bound by that case."). Accordingly, we reject the government's argument that *Wright v. Henkel* and its progeny foreclose Parretti's argument that, in the absence of a finding that he was either a flight risk or a danger to the community, his detention without bail violated the Fifth Amendment.

## B

### The Merits of Parretti's Due Process Claim

■ In arguing the merits of Parretti's due process claim, both Parretti and the

government rely on *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). In *Salerno*, the Supreme Court rejected a due process challenge to the Bail Reform Act of 1984, 18 U.S.C. § 3142(f) (1994), which authorized pre-trial detention without bail upon a showing that no release condition would reasonably assure the safety of the community. After declaring that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the Court held that the safety of the community was a sufficiently "legitimate and compelling" government interest to justify the "carefully limited exception" carved out by Congress in the Bail Reform Act of 1984. *Id.* at 749, 755, 107 S.Ct. at 2102–03, 2105–06. Such carefully limited exceptions are permitted only when the government's interest is "sufficiently weighty" to subordinate "the individual's strong interest in liberty" to "the greater needs of society." *Id.* at 750–51, 107 S.Ct. at 2103.

The government asks us to carve out another exception to the rule that "liberty is the norm" in order to deprive extraditees of their personal liberty pending extradition hearings. It argues that its interest in fulfilling our obligations under extradition treaties is sufficiently compelling to justify pre-hearing detention regardless of how slight the risk that the detainee will jump bail and make it impossible to deliver him to the requesting government. As the government puts it, detention is necessary to "avoid[ ] *any* risk that the extraditee may flee [before an extradition hearing]." Pet. for Reh'g at 14 (emphasis added). In other words, the government maintains that its interest in fulfilling its treaty obligations is so compelling that it justifies detention pending *every* extradition hearing regardless of how negligible the risk of flight.

The government is correct, of course, that the enforcement of extradition treaties is an

---

**24.** Cases applying the "special circumstances" doctrine rely on the dictum in *Wright v. Henkel* that "[w]e are unwilling to hold that ... while bail should not ordinarily be granted in cases of

foreign extradition, th[e] courts may not in any case, and whatever the special circumstances, extend that relief." 190 U.S. at 63, 23 S.Ct. at 787.

important governmental interest. If we fail to honor our treaty obligations, we run the risk that our treaty partners will refuse to honor their reciprocal obligations to us, which would indeed be a blow to our ability to track down suspects and enforce our own criminal laws. The government is also correct that its inability to fulfill these treaty obligations could "have wide ranging effects on the government's ability to assure compliance by foreign governments with their reciprocal treaty obligations to the United States and to convince foreign governments that it is worth their while to enter into mutual extradition treaties with the United States." Pet. for Reh'g at 14.

The problem with the government's argument is the implicit premise that its interest in the enforcement of extradition treaties is materially different from and greater than its interest in the enforcement of our own criminal laws. In the last analysis, the purpose of extradition treaties is to strengthen our hand in enforcing our own laws through the cooperation of other countries in apprehending fugitives. Yet the government implicitly argues that the law enforcement interest served by extradition treaties is somehow different from and greater than its interest in enforcing our domestic laws. The government fails to suggest any difference, and we can fathom none.

If the government's interest in avoiding all risk of flight pending an extradition hearing justified detention without bail, then it stands to reason that the same interest would also justify pre-trial detention in domestic criminal cases. Yet if Parretti had been arrested on charges of violating our own laws against business fraud, and was neither a flight risk nor a danger to the community, it would be unthinkable that he could be held without bail pending trial. It should be equally unthinkable that he may be held without bail pending an extradition hearing.

The government cites no authority for the proposition that its interest in "avoiding any risk that the extraditee may flee", Pet. for Reh'g at 14, is sufficiently weighty to justify detention without bail pending an extradition hearing. As far as we know, the only governmental interest that has ever been deemed sufficiently weighty to justify pre-trial or pre-hearing detention without bail absent a finding of flight risk is the safety of the community. Indeed, the cases cited by the government only serve to emphasize that public safety is the only interest that has ever been deemed sufficiently compelling to justify pre-trial detention without bail in the absence of a finding of flight risk. In *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), for instance, the Supreme Court upheld the pretrial detention of juveniles when there was a "serious risk" that the juvenile might "commit a crime before his return date." *Id.* at 263, 268, 104 S.Ct. at 2409, 2412. The Court identified the interest served as "protecting the community from crime." *Id.* at 264, 104 S.Ct. at 2410. In *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), the commitment of a mentally ill person following an insanity acquittal was upheld because the purpose of commitment "is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Id.* at 368, 103 S.Ct. at 3052. Similarly, in *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), the detention of Communists without bail pending deportation proceedings was upheld because "there is [a] reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542, 72 S.Ct. at 535. Recently, our court held that the detention of an excluded alien whose country would not accept his repatriation did not violate the Fifth Amendment because the alien was potentially dangerous. *Alvarez–Mendez v. Stock*, 941 F.2d 956, 962 (9th Cir.1991). Finally, in *Salerno*, the Supreme Court's review of its detention jurisprudence demonstrates that the need to protect the community from danger was the common thread running through all of the cases permitting the pre-trial detention of persons who are not found to be flight risks. *Salerno*, 481 U.S. at 748–49, 107 S.Ct. at 2102–03.[25]

---

25. All of the cases cited by the Court in *Salerno* involved the need to protect the community from danger:

In essence, the government asks us to break new constitutional ground in holding that Parretti's "strong interest in liberty," *Salerno*, 481 U.S. at 750, 107 S.Ct. at 2103, may be "subordinated," *id.*, to the government's interest in avoiding the risk of being unable to carry out its treaty obligations, however attenuated that risk might be.[26] On that logic, the government would never have to prove that an extraditee was a flight risk. All extraditees could be detained without bail before their extradition hearings regardless of the magnitude of the risk of flight. Such a far-reaching exception to the principle that "liberty is the norm" cannot be justified by the government's asserted interest in taking no risk that it will be unable to deliver an extraditee if he is found to be extraditable. Enforcement of our own laws, which, after all, is the governmental interest served by extradition treaties, does not justify pre-trial detention absent a finding of flight risk or dangerousness, and we see no reason, and the government suggests none, why its interest in fulfilling its treaty obligations is different from or any more compelling than its interest in enforcing our own criminal laws.

Just as the government's asserted interest in avoiding all risk that a defendant will not appear for trial is not sufficient to justify pre-trial detention, the government's asserted interest in avoiding all risk that an extraditee will not appear for an extradition hearing cannot justify pre-hearing detention.

We repeat that the district court was free to decide anew whether to grant or deny Parretti bail once it found Parretti extraditable after his hearing. *See supra* footnote 6. Our holding is a limited one: until such time as an individual is found to be extraditable, his or her Fifth Amendment liberty interest trumps the government's treaty interest unless the government proves to the satisfaction of the district court that he or she is a flight risk.

We find support for our holding in the cases that apply the "special circumstances" doctrine. Those cases recognize that individual interests that are not as weighty as an individual's "core" liberty interest in being free from bodily restraint, *see Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) ("Freedom from

For example, in times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the Government believes to be *dangerous*. See *Ludecke v. Watkins*, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948) (approving unreviewable executive power to detain enemy aliens in time of war); *Moyer v. Peabody*, 212 U.S. 78, 84–85, 29 S.Ct. 235, 236–37, 53 L.Ed. 410 (1909) (rejecting due process claim of individual jailed without probable cause by Governor in time of insurrection). Even outside the exigencies of war, we have found that sufficiently compelling governmental interests can justify detention of *dangerous* persons. Thus, we have found no absolute constitutional barrier to detention of potentially *dangerous* resident aliens pending deportation proceedings. *Carlson v. Landon*, 342 U.S. 524, 537–542, 72 S.Ct. 525, 532–35, 96 L.Ed. 547 (1952); *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). We have also held that the government may detain mentally unstable individuals who present a *danger* to the public, *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), and *dangerous* defendants who become incompetent to stand trial, *Jackson v. Indiana*, 406 U.S. 715, 731–39, 92 S.Ct. 1845, 1854–59, 32 L.Ed.2d 435 (1972); *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956). We have approved of postarrest regulatory deten-

tion of juveniles when they present a continuing *danger* to the community. *Schall v. Martin, supra.* Even competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system. If the police suspect an individual of a crime, they may arrest and hold him until a neutral magistrate determines whether probable cause exists. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Finally, respondents concede and the Court of Appeals noted that an arrestee may be incarcerated until trial if he presents a risk of flight, see *Bell v. Wolfish*, 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) or a *danger* to witnesses. *Salerno*, 481 U.S. at 748–49, 107 S.Ct. at 2102–03 (emphases added). We note that although *Gerstein v. Pugh* allows an individual to be held without bail without a showing that he is either a flight risk or a danger to the community, the detention may last only as long as is required to obtain a hearing before a magistrate, and in no event longer than 48 hours absent extraordinary circumstances. *County of Riverside v. McLaughlin*, 500 U.S. 44, 57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991).

**26.** In Parretti's case, no treaty obligation to surrender him had yet arisen at the time of his "provisional" arrest because France had 40 more days under the Treaty to make up its mind whether to request his surrender.

bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."), may outweigh the government's interest in taking no risk of being unable to fulfill its treaty obligations. For example, in *In re Mitchell*, 171 F. 289, 290 (S.D.N.Y.1909) (L.Hand, J.), an extraditee was released on bail because of the "special circumstance" that he needed to consult with his attorney in a civil action upon which his "whole fortune" depended. In other words, the "special circumstances" doctrine permits even economic interests to outweigh the government's asserted interest in taking no risk that it will be unable to fulfill its treaty obligations.[27] It follows that Parretti's core liberty interest also outweighs that interest, absent a finding of flight risk.

In sum, the government asks us to hold that its interest in avoiding the risk of being unable to fulfill a treaty obligation, however slight, justifies detention without bail pending an extradition hearing. To repeat, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755, 107 S.Ct. at 2105. The exception the government asks us to make is not carefully limited, nor is it supported by a sufficiently weighty governmental interest. Accordingly, Parretti's detention without bail prior to the extradition hearing denied him due process of law even though Parretti failed to make a showing of "special circumstances" to the satisfaction of the district court.

## CONCLUSION

The issuance of the warrant for Parretti's arrest violated the Fourth Amendment and

Parretti's detention without bail prior to the extradition hearing violated the Due Process Clause of the Fifth Amendment.

The judgment of the district court denying Parretti's petition for habeas corpus and its order denying bail pending his extradition hearing are REVERSED.

REINHARDT, Circuit Judge, concurring:

I concur in Judge Norris's opinion for the court, completely with respect to the Fourth Amendment analysis and in large part with respect to the Fifth Amendment discussion. While I agree unequivocally with all of the conclusions expressed in that opinion, I write separately regarding the due process question in order to offer a perspective on the subject that is different in a few respects, but in my view serves only to bolster the opinion's rationale.

Parretti asks us to consider for the first time whether the " 'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial," *United States v. Salerno*, 481 U.S. 739, 749, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987), applies to detentions involving foreign extradition proceedings, and, if so, whether it precludes the use of the so-called "special circumstances test" as it has generally been applied. For the reasons stated in Judge Norris's opinion, I think that an international extraditee's Fifth Amendment interest in release on bail would be infringed by the application of so inflexible and arbitrary a test.[1] However, I believe

---

**27.** One commentator has made the following poignant comment about the special circumstances doctrine:

> So long as the accused poses no threat to the community, the national interests are fully served if the accused does not abscond. That the accused presents "special circumstances" adds nothing to protection of these interests. Conversely, if the accused is likely to flee, the governmental interests are vulnerable, no matter what the "special circumstances."

Note, *A Recommended Approach to Bail in International Extradition Cases*, 86 Mich. L.Rev. 599, 614 (1987).

**1.** Aside from the due process issue, there is also an independent question as to whether the Ex-

cessive Bail Clause of the Eighth Amendment protects extraditees or potential extraditees against a per se or "special circumstances only" ban on bail. The Supreme Court has never ruled on that question. *See Salerno*, 481 U.S. at 754, 107 S.Ct. at 2105 ("[W]e need not decide today whether the Excessive Bail Clause speaks at all to Congress's power to define the classes of criminal arrestees who shall be admitted to bail."). Although Parretti did not allege an Eighth Amendment violation, we would be free to evaluate the implications of the Excessive Bail Clause for his case in order to avoid injustice. *See, e.g., Donovan v. Crisostomo*, 689 F.2d 869, 874 (9th Cir.1982). We need not do so, however, because, as the opinion for the court makes plain,

that the government's interests in detaining international extraditees are more substantial than his opinion suggests and that, while the standards that govern bail are the same in foreign extradition and domestic criminal cases, the factual circumstances of the two types of cases are typically quite different and thus the results will also often be different. More important, I do not believe that the Supreme Court ever propounded the so-called special circumstances test or ever intended that such a test be employed. Finally, the conditions that might once have served as a rationale for a blanket rule making bail unavailable in foreign extradition cases no longer obtain. There simply can be no justification for applying any such rule in current times.

## I.

In reaching its decision to deny the bail motion, the district court held that although Parretti was not a flight risk, he failed to demonstrate that his case involved "special circumstances" warranting release. As I read the relevant case law, neither the Supreme Court nor this court has ever explained what such a "special circumstances test" might entail, or identified the full range of circumstances that would count as "special" enough to satisfy it. There is good reason for that failure, at least as far as the Supreme Court is concerned. The "special circumstances doctrine" purportedly derives from the Court's opinion in *Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903), a case in which, as Judge Norris explains, the extraditee did not offer a constitutional challenge to the lower court's refusal to admit him to bail. Thus, as Judge Norris correctly states, the Supreme Court did not resolve the issue of the special circumstances doctrine's constitutionality in that case. Even more fundamental—and this the opinion for the court fails to recognize—although several circuits including ours have assumed the existence of a special circumstances doctrine, supposedly adopted in *Wright v. Henkel, neither in that case nor in any other did the Supreme Court create or intend to create such a doctrine.* Instead, in *Wright v. Henk-*

*el* the Court made only a single, casual remark about "special circumstances," a remark that has subsequently been blown out of all proportion by lower courts, including most recently ours.

The only paragraph in *Wright v. Henkel* that touches upon the subject of special circumstances reads:

We are *unwilling* to hold that the Circuit Courts possess no power in respect of admitting to bail other than as specifically vested by statute, or that, while bail should not ordinarily be granted in cases of foreign extradition, those courts may not in any case, and whatever the special circumstances, extend that relief. *Nor are we called upon to do so* as we are clearly of [the] opinion, on this record, that no error was committed in refusing to admit to bail, and that, although the refusal was put on the ground of want of power, the final order ought not to be disturbed.

*Id.* at 63, 23 S.Ct. at 787 (emphasis added). Although it ultimately concluded that Wright failed to show that the trial court had erred in refusing to release him on bail, the Supreme Court did *not* hold that he failed to meet any "special circumstances test," nor did it assert that the trial court lacked the authority to grant the relief he requested. It simply concluded that "no error" had occurred. It then went on to hold that, even without statutory authorization, courts *do* have discretion (whatever the relevant limitations) to grant bail in extradition cases.

The quoted paragraph contains the only clause ("... while bail should not ordinarily be granted in cases of foreign extradition ...") that might be thought to support the type of rule that some federal courts have assumed to exist, but the clause is subject to that interpretation only when read out of context. It is merely a preliminary, though accurate, comment introducing a conclusion that expands rather than contracts the power of courts to admit a detainee to bail while specifically refusing to adopt any rule that would preclude bail in all such cases. The only plausible reading of the paragraph as a whole is that the Court *declined* to adopt

the Due Process Clause alone is sufficient to

afford Parretti all the relief he seeks.

either a per se rule or any form of test regarding the conditions justifying the denial of bail in foreign extradition cases because it did not need to reach that question in order to decide the case before it, and that the Court doubted that any rigid formula could be imposed because the "special circumstances" of the case would be relevant to the determination whether a court should allow bail.

In short, the Supreme Court plainly did *not* hold in *Wright v. Henkel* that "special circumstances" are required in order to justify bail in an extradition case. Rather, it said that it would not adopt an absolute ban on bail that would apply in all cases regardless of the special circumstances. That, to me, is no different than saying that it would not adopt a ban that applied regardless of the "particular circumstances." In other words, the Court simply explained that whether a detainee would be eligible for bail would depend upon the circumstances of the individual case, whatever they might be. Any interpretation of *Wright v. Henkel* that suggests otherwise is, in my view, a misreading of the Supreme Court's opinion.

Nevertheless, this court and others have on a number of occasions invoked some sort of "special circumstances test." *See, e.g.,* *Martin v. Warden,* 993 F.2d 824, 827–28 (11th Cir.1993); *United States v. Russell (In*

*re Extradition of Russell),* 805 F.2d 1215, 1216–17 (5th Cir.1986); *United States v. Williams,* 611 F.2d 914 (1st Cir.1979) (per curiam) (2–judge panel). We have done so in cases such as *United States v. Smyth (In re Extradition of Smyth),* 976 F.2d 1535 (9th Cir.1992), which Judge Norris's opinion cites, although we have not even purported to explain what considerations such a test would involve.[2] Moreover, as Judge Norris's opinion for the court correctly states, we have never considered whether the elements of such a test are constitutional. Whatever "special circumstances" we may have had in mind at any particular point, the practical effect of cases like *Smyth* is that they render the traditional standards governing bail inapplicable and instead focus on a limited set of factors unrelated to government's interest in insuring the potential extraditee's presence at the extradition proceedings. The "circumstances" that courts have labelled as "special" include the individual's need to be free in order "to consult with his attorney in a civil action upon which his 'whole fortune' depends," *Williams,* 611 F.2d at 915 (1st Cir.1979) (per curiam) (2–judge panel) (citation omitted), unusual delay in conducting an extradition hearing, *see In re Extradition of Morales,* 906 F.Supp. 1368 (S.D.Cal.1995), or "a serious deterioration of health while incarcerated," *Salerno v. United States,* 878 F.2d 317 (9th Cir.1989) (2–judge panel). Requir-

**2.** We have only mentioned the special circumstances doctrine in four cases, none of which sheds any light on our inquiry into the doctrine's content or its constitutionality. In *Kamrin v. United States,* 725 F.2d 1225 (9th Cir.1984), we considered the appellant's due process challenge to extradition for a crime he was alleged to have committed abroad based upon the fact that the statute of limitations for a similar crime under United States law would already have run. We rejected appellant's proffered analogy to the bail context, noting in dicta that bail in foreign extradition cases is not a "remedy or recourse" under United States law because its availability is limited to special circumstances. Next, citing to one out-of-circuit extradition case, two *domestic* bail cases, and the *Kamrin* dicta (as well as misreading *Wright v. Henkel* ), a two-judge panel of this court in *Salerno v. United States,* 878 F.2d 317 (9th Cir.1989), issued what appears to be a brief order assuming without any analysis that "[t]here is a presumption against bail in an extradition case and only 'special circumstances' will justify bail." *Id.* at 317. (The precedential value of the two-judge order is highly dubious for rea-

sons that are not worth explaining here. *Cf.* 28 U.S.C. § 46(b); Ninth Circuit General Orders § 6.3.g.(3).) In *United States v. Smyth,* 976 F.2d 1535, we again issued a brief order, this time reversing a district court's finding of special circumstances. In doing so, we rejected the district judge's determination that certain circumstances were out of the ordinary, but we never so much as mentioned whether he was actually required to make a finding of special circumstances in order to justify release on bail. Nor did we state whether or not the appellant was a flight risk. In our most recent case, *United States v. Kirby (In re Requested Extradition of Kirby),* 106 F.3d 855 (9th Cir.1996), we purported to apply a presumption against bail in foreign extradition cases derived from *Wright v. Henkel.* Without discussing what factors must be shown to overcome that presumption, we criticized the district court's findings of special circumstances, but then blithely concluded that the case did involve "special circumstances" warranting the granting of bail because the potential extraditees "enjoy the sympathy and are objects of concern of many Americans." *Id.* at 106 F.3d at 864–65.

ing incarceration except where the detainee shows the existence of such a factor would conflict directly with the principles underlying our historic system of bail. In many cases, it also would lead inevitably to the unconstitutional deprivation of the potential extraditee's Fifth Amendment liberty interest in retaining his freedom until such time as he may be proven guilty of a criminal act. *See Salerno*, 481 U.S. at 748, 107 S.Ct. at 2102.

## II.

Although the Supreme Court did not adopt the unconstitutional special circumstances test, or indeed any test, for granting bail when it decided *Wright v. Henkel*, there were undoubtedly substantial differences in 1903 between run-of-the-mill domestic cases and the pool of foreign extradition cases that led the Court to conclude that in most instances international extraditees were far more likely to flee than domestic detainees. At the time *Wright v. Henkel* was decided, foreign extradition cases were rare: The time, expense, and dangers attendant upon international travel made international crimes and international criminals most unusual. Further, there were relatively few classes of conduct that were likely to prompt a foreign government to seek extradition.[3] In short, the group of people likely to be the subject of extradition requests was not only small in number but relatively homogeneous, and courts did not generally need to engage in detailed and highly fact-bound inquiries in order to determine the risk of flight that any particular extraditee posed. In most instanc-

es courts could simply assume that an individual accused of committing a crime in a foreign country was likely to be a far greater flight risk than the typical domestic criminal: thus, the dictum that bail should not "ordinarily" be granted in foreign extradition cases. 190 U.S. at 63, 23 S.Ct. at 787.

Today, foreign extradition cases as a whole may continue to present somewhat of a greater risk of flight than cases involving run-of-the-mill domestic crimes; however, the differences between the two classes of cases are no longer as significant, and the number of potential extraditees who are not flight risks is proportionally far greater than a century ago. As to the continued risk, foreign extraditions frequently involve citizens of a foreign nation who, like Parretti, are in the United States on international business when they are apprehended. The potential extraditees are often people who regularly engage in international travel and whose exclusive ties and assets are foreign. Some cases involve people who have already fled another country and are here only because they are seeking to escape prosecution and punishment elsewhere. In all such instances, there is cause for heightened concern that the international arrestee will attempt to flee the United States rather than remain in the jurisdiction while awaiting foreign extradition. Thus, it is still reasonable to conclude that in a number of cases "international criminals" awaiting extradition will be greater flight risks than the average person awaiting prosecution for the run-of-the-mill federal or state crime.[4]

---

**3.** *Wright v. Henkel* involved an individual who was being extradited for making, circulating, and publishing false corporate reports with the intent to defraud shareholders. 190 U.S. at 41, 23 S.Ct. at 781 (Court's statement of case). The dispute that was the main subject of the appeal was not whether Wright was entitled to bail but whether he was extraditable, as the treaty provided for extradition only for those actions of corporate officers that were crimes under the laws of both countries. *Id.* at 46, 23 S.Ct. at 783. Because the State of New York had only partially criminalized conduct such as Wright's, leaving much of it subject only to civil penalties (as it traditionally had been), the question the Court chiefly addressed was whether extradition was even available in that case.

**4.** In addition to flight risk, bail may be denied on the ground of danger to the community. *See Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697. With respect to the latter concern, I suspect that foreign extradition cases generally involve less rather than more such danger because, as the risk of international flight increases, the likelihood that the individual will remain here and commit serious offenses diminishes. The exception may be terrorist activity: In certain types of terrorist cases, at least, there is frequently *both* significant flight risk *and* danger to the community.

Nevertheless, there *are* foreign extradition cases—and undoubtedly not a small number—that are not "ordinary" in the historical sense. Today, for example, drug offenses, economic fraud, and other classes of crimes frequently involve a large international component, yet many individuals engaged in those activities do so without ever going abroad. *Modern telecommunications and the internet enable ordinary people to become* "international criminals" in their own living rooms, and such individuals will in most cases be no more anxious to flee their country (or even their hometown) to avoid prosecution than the person charged with the typical domestic offense. Moreover, international travel is no longer reserved to the privileged few. Many average persons with homes, families, and principal assets in the United States now frequently visit foreign countries, for business or for pleasure, and some may, upon returning home, discover that a foreign government is considering filing charges against them because of conduct in which they allegedly engaged while abroad. Additionally, the rise of multinational corporations and the expansion of foreign criminal laws to encompass conduct previously not prohibited, such as bribery of government or corporate officials, influence-peddling, or even commercial espionage, have resulted in persons being subject to prosecution whose conduct was not previously thought to be unlawful. Many of these persons will also be most reluctant to flee and will instead desire to assert vigorous challenges to the recently-enacted legislation or the allegations of wrongdoing. In short, the net of extraditable crimes is cast far more widely these days and now covers substantial numbers of persons who have significant ties to the United States or who for other reasons are not likely to become fugitives and forfeit the opportunity to reside in this country in the future. Given these circumstances, it would be particularly inappropriate to adhere to a rule that requires the incarceration of persons in our jails for substantial periods of time, without any opportunity to obtain bail, simply because a foreign nation is *considering* whether to ask for their extradition.[5]

One major change in the extradition area is particularly noteworthy in connection with our examination of contemporary extradition concerns. When *Wright v. Henkel* was decided, United States extradition treaties ordinarily contained an exclusion for United States citizens. Siegfried Wiessner, *Blessed Be the Ties That Bind: The Nexus Between Nationality and Territory,* 56 Miss.L.J. 447, 527 n. 367 (1986) (collecting treaties). For example, an extradition treaty between the United States and France signed only a few years after *Wright v. Henkel* was decided contained such a provision, *see* Extradition Treaty, Jan. 6, 1909, U.S.–Fr., T.S. No. 561, art. V, and the Supreme Court ultimately held that the effect of that exclusion was to leave the government wholly without authority to grant extradition of United States citizens to France, *see Valentine v. United States,* 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936). Today, however, our government is far more willing to grant extradition of United States citizens. *See* Weissner, *supra,* at 528. For example, although the current treaty with France (which governs Parretti's extradition) still does not *require* the United States to grant extradition of its own citizens, it does give the president *discretion* to do so if he so chooses. Supplementary Convention to the Extradition Convention of January 6, 1909 Between the United States of America and France, Feb. 12, 1970, U.S.–Fr., art. III, T.I.A.S. No. 7075. Indeed, some treaties

---

**5.** In this case, the treaty provided for an initial period of forty days from the date of Parretti's incarceration during which France could decide whether to seek his extradition. The enabling statute for United States extradition treaties authorizes provisional arrest and detention for up to *ninety days* prior to the foreign government's presentation of a formal extradition request. *See* 18 U.S.C. § 3187. Individuals have in fact been incarcerated for periods of years awaiting a final determination as to extradition. *See, e.g., Kirby,* 106 F.3d at 863 (three potential extraditees released on bail after being incarcerated in United States for 3–1/2 years, 3 years, and 11 months respectively pending final determinations of extraditability); Serge Schmemann, *Israel Withdraws Bid to Extradite a Chief of Hamas,* N.Y. Times, Apr. 4, 1997, at A1 (reporting Israel's withdrawal of extradition request after subject of request, who had been incarcerated in United States for 21 months pending determination of extraditability, announced that he would no longer contest extradition).

currently in force *do* require the government to treat requests for extradition of United States citizens the same as it treats requests for non-citizens. *See, e.g.,* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, Oct. 13, 1983, U.S.–Italy, art. IV, T.I.A.S. No. 10837 ("A Requested Party shall not decline to extradite a person because such a person is a national of the Requested Party."). In light of this significant change in United States extradition policy, the basis for generalizations about international extraditees that underlay *Wright v. Henkel* has been eroded even further.

Given the substantially changed conditions, the prediction in *Wright v. Henkel* that potential extraditees will not normally qualify for bail is far less reliable than it was when originally offered. Although I believe that it is still appropriate to start from the premise that foreign extradition cases will ordinarily involve a greater degree of flight risk than domestic criminal cases, the need to evaluate the facts and circumstances in each extradition proceeding on a case-by-case basis is far greater today than it was in 1903. From a constitutional standpoint, there is simply no justification for the automatic denial of bail in extradition cases, even with the theoretical escape hatch provided by the "special circumstances doctrine." A rule that precludes release notwithstanding the absence of flight risk or danger to the community is far more likely today than a century ago to result in the prolonged detention of individuals who under the Due Process Clause of our Constitution are entitled to remain free on bail.

Because the United States is not the prosecutor in international extradition cases, the government's interests in seeing that the "criminals" in those cases are detained while awaiting extradition, prosecution, and punishment may at first appear to be less weighty than its interests in detaining persons awaiting domestic prosecution. I agree with Judge Norris that they are not. However, I disagree that the government's interests in fulfilling its treaty obligations stems solely from its interest in domestic law enforcement, i.e., punishing domestic crimes. *Cf. supra* at 49–50, 23 S.Ct. at 784. The failure of a country to deliver on its promises can have many unpredictable consequences quite apart from the effects on its ability to secure the assistance of others when it is the one that desires to obtain or exercise the right to extradite. It is important to the nation's overall ability to work effectively in the international arena that it be thought of as a country that keeps its commitments. Moreover, our domestic law enforcement interest in fulfilling our treaty obligations is more direct than Judge Norris's opinion suggests. As I have noted, these days crimes no less than corporations are multinational, and so are their consequences. The government frequently has a significant interest in seeing that criminals who have fled to, or happen to be in, this country are punished for their foreign crimes—if only because those crimes may have a substantial effect, direct or indirect, on American interests both at home and abroad. In the end, I agree with the court's opinion that the overall interests of the United States in preventing flight in foreign extradition cases warrant roughly the same level of concern as in preventing flight in domestic criminal proceedings. Although the factual inquiries and considerations are frequently quite different, neither a greater nor a lesser showing of flight risk is called for in one category of case or the other.

To sum up, in addition to the conclusions we express today that the warrant for Parretti's arrest violated the Fourth Amendment; that the "special circumstances test" courts have sometimes purported to apply violates the Due Process Clause; and that the showing of flight risk traditionally required in domestic cases is also the appropriate showing for foreign extradition cases; and in addition to my own separate conclusion that the so-called "special circumstances" test was never adopted by the Supreme Court and never intended by that Court to be employed by the lower courts; I would add that while the assumptions that underlay the Court's comment in *Wright v. Henkel* were not without merit, today's circumstances are considerably different. Although in a number of foreign extradition cases, there may still be a greater justification for concluding that a potential extraditee is a flight risk, there is now a far larger

percentage of such cases in which that is plainly not so. In the absence of a factual showing that a potential extraditee is a flight risk, or that he is a danger to the community, the Due Process Clause requires release on bail—not the application of a special circumstances test.

PREGERSON, Circuit Judge, dissenting:

During the course of these extradition proceedings, Giancarlo Parretti was released from custody on bail and fled the country. When a criminal defendant becomes a fugitive from justice, courts have discretion to dismiss the defendant's appeal because his absence "disentitles the defendant to call upon the resources of the Court for determination of his claims." *Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 499, 24 L.Ed.2d 586 (1970) (per curiam); *see also Roby v. United States Dep't of the Navy,* 76 F.3d 1052, 1055 n. 2 (9th Cir.1996) (noting that the court would have discretion to dismiss case based on disentitlement theory where plaintiff took unauthorized leave from the Navy); *United States v. Van Cauwenberghe,* 934 F.2d 1048, 1054 (9th Cir.1991) (noting long history of equitable doctrine of fugitive disentitlement).

Dismissal is an appropriate option under the disentitlement doctrine because dismissal preserves this court's "interest in efficient, dignified appellate practice." *Ortega–Rodriguez v. United States,* 507 U.S. 234, 242, 113 S.Ct. 1199, 1204–05, 122 L.Ed.2d 581 (1993). Moreover, Parretti's flight threatens the effective operation of the appellate process. Parretti's counsel may have no desire to represent Parretti zealously in future proceedings that may result from the majority's opinion (e.g., petition for rehearing and suggestion for rehearing en banc, en banc review, or appeal to the Supreme Court). In addition, this court no longer has control over one of the parties-Parretti. *See United States v. Sharpe,* 470 U.S. 675, 724, 105 S.Ct. 1568, 1595–96, 84 L.Ed.2d 605 (1985) (Stevens, J., dissenting) (explaining how the adversary character of the litigation may be compromised when one of the litigants is a fugitive) (citing *Molinaro,* 396 U.S. at 366, 90 S.Ct. at 498–99). Because Parretti's fugitive status creates the risk that the adversary process will not effectively function, we should exercise our discretion and dismiss the present appeal.